**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LABARRON TATE,<br>SARAH BANNISTER,<br>Plaintiffs,<br>　v.<br><br>THE UNITED STATES TREASURY<br>DEPARTMENT in its sovereign capacity,<br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Case Number 20-cv-4458 |

**<u>ORIGINAL COMPLAINT</u>**

## I.  <u>PRELIMINARY STATEMENT</u>

.

Over the past few weeks, senior officers of this government have declared that the recent protests have descended into an "orgy of violence" and "plunged American cities into anarchy." Protesters have been indiscriminately characterized as "anarchists" and "looters" whose lawlessness has caused "tens of millions of dollars" in damage that must be expiated through overwhelming military force. And yet it was members of this government who twenty years ago sat quietly and listened as men in 'white collars and cut fingernails'[1] rationalized their misappropriation of $40 million in federal funds on the grounds that it "doesn't make a big difference in the grand scheme of thing."  This act was not condemned as looting, but instead was 'minuted, seconded and carried' as an accounting irregularity.[2]  There is little gain to be had in questioning the validity of this double standard, and no irony will be found in observing that in the brutal and unsentimental places where the military is used against civilians, the only crime greater than theft from the sovereign is failure to punish another's theft from the sovereign.

Sallie Mae took money from its principal, and when this breach was forgotten, it used the residual badges of this theft to mislead borrowers into believing that their debts were *bona fide* federally funded and thus immune from usury laws and bankruptcy laws while simultaneously denying debtors the deferment and stay of payment that Congress said federal debtors should have under the CARES Act. The government enjoys the discretion to forgive, but an abstract hypocrisy becomes a concrete injury when the very debtors that the government has labeled "looters" is forced to bear the cost of the government's selective acts of mercy.

---

[1] President Reagan, Evil Empire Speech, March 8, 1983 (quoting C.S. Lewis).

[2] Navient owes this government another $22 million from "overcharges" in an unrelated event but refuses to pay as it continues to assess its appellate strategy. YAHOO FINANCE, *Bilking taxpayers: Warren demands $22 million owed by student loan servicer Navient*, (Jan 29, 2020), *available at:* https://finance.yahoo.com/news/navient-owes-22-million-warren-letter-200323074.html

## II.   PARTIES

2.      Sarah Bannister is an individual and resident of New York City.

3.      LaBarron Tate is an individual who attended Full Sail University.

4.      The Hon. Steven Mnuchin is the Secretary of the Treasury and a senior officer of this Administration and may be served in the District of Columbia.

5.      The United States Treasury Department is an executive agency and may be served in the District of Columbia.

## III.   JURISDICTION AND VENUE

6.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § § 1331, 2201 because this case arises under federal law.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## IV.   FACTS

### A.  The Higher Education Act of 1965

8.      The Higher Education Act of 1965 authorized the Guaranteed Loan Program ("GSL" and later the "FFEL Program" or "FFELP"), and the National Direct Student Loan (later "Perkins Program" and collectively as "Title IV Programs").  Title IV Loans were made at below market interest rates, without credit checks, without cosigners and "without business considerations."

9.      The Title IV Loan Programs required a large administrative apparatus, which Congress intended to accomplish through a public-private partnership.  In addition to the colleges and universities, managing the loan programs would require the participation of banks, sureties, state agencies, servicing agents, and debt collectors.

3

10.     Since 1965, Congress has insured, guaranteed or originated $2.4 trillion in student

loans, a portfolio equaling approximately one half of this government's assets. Yet owing in large

part to the conduct of its chief agent, the Title IV Programs are universally criticized and

mistrusted.

### B.   1972-1996: Sallie Mae

11.     This agent was created by Congress in 1972 in order to facilitate more liquidity in

the secondary FFELP market. Congress was advised to structure the agency as a government

service enterprise, or GSE, which was named the Student Loan Marketing Company, or Sallie

Mae. GSEs were a hybrid corporate form that was intended to accomplish public policy goals

through private enterprise.

12.     Congress hired Edward Fox, a thirty-six-year-old assistant from the home loans

department, as the first CEO. Fox was an odd choice. He had never worked in finance, was

outspokenly not interested in either government service,[3] or education,[4] and once described the

tenets underpinning Sallie Mae's charter as "the most simplistic pap I have ever heard in my life."

13.     And he was soon to remake Sallie Mae in his own image.

14.     Under Fox's leadership, Sallie Mae was reported to spend most of its time

perfecting the art of OTC arbitrage swaps and by 1990, Fox had loaded Sallie Mae with more than

$20 billion in taxpayer secured debt. Sallie Mae did facilitate the secondary market and expanded

the volume of FFELP Loans.  But interest rates were not dropping as projected, and Congress was

---

[3] "The culture of the people who started the business was free enterprise – the notion that you didn't need government to do anything." Fox was prepared to not need the government at all so long as they gave him some money first. "We were getting clobbered. We were losing on every loan we owned. We needed help in the Congress immediately."

[4] "We're not educators and we don't pretend to be."

constantly butting heads on whether Sallie Mae answered to the Hill or the financial community. This ultimately led Treasury to conclude that, "Sallie Mae's story is one of a basic conflict."

15.     This and other unresolved conflicts of interest ended in a massive bribery and fraud scandal.  And it must be conceded that on at least this one occasion, Congress called the spade a spade and not an 'asset transfer misunderstanding' or 'act of mistaken gifting.' "The Department of Education had all but abdicated its responsibility to the students it is supposed to service and the taxpayers whose interests it is charged with protecting. Fraud and abuse were able to thrive because through gross mismanagement, ineptitude, and neglect in carrying out its regulatory and oversight functions.  We have heard no testimony or seen any documents that suggest that the Department has done even an adequate job in managing and overseeing its student loan program."

16.     Congress thereafter became disillusioned with the FFEL Program and authorized the creation of the Direct Loan Program ("DLP") that would eliminate the need for a secondary market by lending federal dollars directly to students. Congress hoped that in time it could finally rid themselves of this turbulent GSE and terminate the FFEL Program.

17.     Congress also enacted criminal penalties to prevent these types of accounting-irregularities in the future and ordered the Secretary of Education to get control of Sallie Mae and the other contractors.

18.     The Department issued a host of new regulations explicitly prohibiting conflicts of interest and misuse of public funds, which Sallie Mae and others vehemently protested. Sallie Mae even sued the federal government for violating its constitutional rights and challenged the prohibition on using taxpayer money to pay the legal fees. "The Secretary does not believe that it is an appropriate use of taxpayer funds to pay for the agencies' unsuccessful court challenges. The

Secretary notes that the right to sue the Federal Government does not include the right to use Federal property to do so."

19.     Sallie Mae lost, and demonstrated a its lack of sportsmanship by conceding that while it might be the government's fiduciary, the federal government was also Sallie Mae's "primary competitor."

20.     But this was not yet an acceptable way for an agent to behave or speak to its principal in the mid-1990s, and many on the Hill and in the Administration became enraged. Congress finally gave Sallie Mae an ultimatum: banishment or liquidation.

### C.  Private Loans and the Privatization Act: 1996-2004

21.     Banishment of course did not mean actual banishment in the sense of a punishment. It meant something more like privatization. And Congress gave Sallie Mae ten years to complete the process of privatization.

22.     But in order to "ensure that Federal funds are not subsidizing non-FFEL guaranty activity," Congress split Sallie Mae split into two: the  public entity called SLMA or GSE would hold all the federal property and federal assets while a new corporation known as SLM, or the Holding Company, would be used to conduct new commercial activity.

23.     Treasury created the Office of Sallie Mae Oversight ("OSMO" or "Treasury") to police the "firewall" that was supposed to keep the public funds completely separate from commercial activity.

24.     SLMA had approximately $50 billion in federal assets, which Congress wanted to be spent furthering the secondary FFELP market.  SLMA was only allowed to facilitate the secondary market and could not originate FFELP Loans. [5]  And under no circumstances could the

---

[5] Except as lender of last resort.

assets of the GSE be available or used to pay claims or debts of or incurred by the Holding Company.

25.     The GSE had to be dissolved no later than 2008 and until that time, SLM could not purchase FFELP Loans. SLM was not allowed to do anything that required a federal or state banking charter such as engage in direct loan originations.  Furthermore, if any loans were made or facilitated by SLM, they could "not be funded with proceeds from debt issued by the GSE nor sold to the GSE." None of this would interfere with SLM's major business plan which was to enter the burgeoning world of private student loans. Years earlier, Fox had boasted of having no small role in creating the concept of what he first described as "non-insured loans."

26.     SLM knew how to get its foot in the door with what Fox had dubbed Sallie Mae's "turn-key loan processing services." This was a service that leased out Sallie Mae employees to perform back-office loan processing for national banks.  Sallie Mae entered into these contracts as SLMA. SLMA would process the loan applications, approve the loans and originate the loans using the national banks' money. After the loans were made, Sallie Mae would buy the loans and then securitize them into tax-exempt bonds.

27.     But nobody was actually interested in Sallie Mae's processing services.  Loan processors are cheap and plentiful.  For all of Fox's devotion to the free market, Sallie Mae's competitive advantage was its connection to and confusion with the government, as one of Fox's colleagues had candidly described to members of Congress: "Sallie Mae's chief selling point is the perceived ties to the government. The fact that Sallie Mae's assets are federally guaranteed, the fact that Sallie Mae has a $1 billion line of credit from the Treasury and the fact that Sallie Mae's securitizes are exempt from State and local taxation all contribute to the perception that Sallie Mae is an agency security."

28.     Now Congress and Treasury permitted SLM to *facilitate* the origination of private loans. But without a banking charter, it was not permitted to *originate* private loans. Treasury, however, soon began to suspect that Sallie Mae was using its "turn-key" services as a means of blurring these lines and breaking these rules. Treasury wrote in its report that, "SLMA in substance, was originating private loans through its back-office servicing agreements under which SLMA would process and disburse the loans."

29.     Sallie Mae denied this allegation.

30.     Treasury went through the transaction step by step. "The funding banks did not take long term possession of the notes signed by the student borrowers, nor did they assume the credit risk associated with the notes. Further, the economic substance of the payments by SLMA to the funding banks reflected loan origination activity via a 'storefront' rather than secondary market activity."

31.     Sallie Mae again denied the allegation.

32.      Treasury finally broke out SEC filings where Sallie Mae had itself reported that it was originating loans.  Sallie Mae was at last forced to confess— but could not resist a final jab at the cyclopes and snidely jested on its way out that, "origination has many meanings."

33.      Originating loans without a banking charter makes the loans void, but it obviously does not constitute misuse of federal property.  *In re Grand Union Co.*, 219 F. 353, 362–63 (2d Cir. 1914) ("There is no principle of law better settled than that a corporation cannot enter into a contract which is expressly prohibited by its charter or by statute. A contract so made is absolutely void."). Treasury seemed unconcerned with the borrowers whose loans were void under this conclusion, but which Treasury decided nothing else could be done to Sallie Mae because of "weak enforcement tools" and a lack of general consensus on how to use them.

8

34.     Otherwise, Treasury seemed to take comfort in the fact that Sallie Mae had "ceased the activity and transferred the loans out of the GSE."  Treasury never disclosed how many loans or how much money this involved.  But since it only appeared in a two-sentence footnote in a 350-page report, one might be led to conclude it was a minor issue—like the $40 million accounting irregularity discussed by the CFO.

35.     Fortunately, Sallie Mae disclosed the size of this transaction in its 10-K filing: $3.4 billion ("During the year, the GSE transferred $3.4 billion in private credit student loans in a series of transactions to a non-GSE subsidiary of the Company. All intercompany transactions between the GSE and the Company and its non-GSE subsidiaries have been eliminated in the consolidated financials.").

36.     What Sallie Mae did not disclose was the controversey that led to the need for this $3.4 billion asset transfer.  That transaction was known in banking as a "rent a charter" scheme, wherer a financial company without a banking charter (and therefore without immunity from state usury laws) enters into an agreement with a national bank to make a pile of loans.  The finance company agreees to perform the back office processing which enables it to pick which loans to make and who to make them to, originatees the loans in the bank's name, and then purchases the loans at a premium to compensate for use of the bank's charter. Any loan made through a rent-a-charter scheme is void, or at least voidable.

37.     But that technically was not what Sallie Mae was doing.  Under the "turn-key servicing" contract with the national banks, SLMA had subcontracted the processing work to Sallie Mae Servicing LLP, which was a subsidiary of SLM.  SLM then put a provision into the contract that allowed *the GSE* to 'advance funds on Stillwater National Bank's behalf if sufficient funds are not in your bank account on the day we attempt to draw from your account.'

9

38.     Thus Sallie Mae was not really renting the bank's charter in any recognized manner. Sallie Mae was using the bank as a vehicle through which to originate loans using the federal government's money (which was illegal), have the bank reimburse SLM for the amount of the loan (also illegal); have SLM purchase the loans from the bank (legal when analyzed in isolation) and then have SLM sell the loans back to the GSE (illegal even in isolation).[6]  This is an extremely convoluted practice, and untangling the layers would make a regulator pine for the halcyon days of the Bank of Fort Sam Houston and its bottle of white-out.[7]

39.     The only remedial measure that Sallie Mae took was to once again transfer the loans out of the GSE and into SLM—which did nothing to change the fact that Sallie Mae had already placed a somewhat ambiguous disclosure into the borrowers' promissory notes stating that the loans were funded in part by non-profit organizations, including the government.

40.     Sallie Mae *technically* had been forced to correct and reverse this accounting irregularity, but Sallie Mae knew what mattered was that loans retain the appearance and color of federal funding. As long as they had the appearance, everyone would think they were entitled to all the protections given federal loans and this in fact would create the value.  For example, defaulted dischargeable debt has a recovery rate of only 8-10% whereas defaulted non-dischargeable federally insured debt has a recovery rate of 48-50%.  Thus, simply by making people *think* the loans were federally funded, Sallie Mae increased the value of these debts five-fold.

---

[6] "You acknowledge that we may subcontract with our affiliate, Sallie Mae Servicing L.P., to perform some or all of the origination and/or servicing activities that we are to perform under this Agreement."

[7] The Bank of Fort Sam Houston, after it had "come into possession" of several thousand defaulted FFLEP loans, had "whited out" the name of the original lender on the notes, wrote in its own name, and submitted these alternated notes to the government for payment. After the government refused to pay, the bank sued the government on the grounds that "no regulation directly forbids the use of an altered promissory note."  The court ultimately found for the government, but not before denying the government's counterclaim for money paid the bank on an earlier tranche of the bank's "altered notes." *American Bank of San Antonio v. U. S.*, 633 F.2d 543, 553 (Ct. Cl. 1980).

41.     And if anyone ever challenged this state of affairs, Sallie Mae and its agents were prepared to tell (and did tell) borrowers both in and out of court that, "the promissory note executed for the Navient Account expressly provides that the loan was funded with federal funds and is non-dischargeable." At the same time, Navient and its agents continue to tell debtors that the loans are immune from state usury laws because they were funded by Stillwater National Bank, or SunTrust Bank, or National City Bank or more than a dozen other national banks that had secured these "turn-key services" with Sallie Mae.

42.     These loans are financial chameleons—just like their creator. They cannot be paid through an income-based plan or be forgiven when a school is exposed as a fraudulent for-profit diploma mill because they are private loans.  And they can be marked as delinquent on credit reports indefinitely and are immune from discharge because they are federal loans.

43.     And the government swept all of that under the rug.  This government sat and listened to Sallie Mae's CEO describe how he had taken advantage of weak oversight on a small bank in Washington DC to make tens of millions in fraudulent debt. "We would do all the work. We would originate the loans and make them available. They would go on their books for about 30 seconds and they would get X dollars just for putting their imprimatur on it. Then it would move to us. End of the story is we made $30 million dollars in loans the first year."

2.     And Treasury sat, listened and took notes while Sallie Mae's CFO spoke casually about the misuse of government property during the privatization:

We would buy something, and the tradition was that since the GSE was the only entity, the GSE paid. Well those practices just continued to happen. It was $40 million on a $35 or $45 billion balance sheet. It doesn't make a big difference in the grand scheme of things. Our philosophy at the time, accounting controls and things of that nature just weren't that important to the outside world. And I don't think there was an appreciation for them pre-Enron. It is just that there was just a tremendous amount of activity going on and the people booking transactions didn't necessarily understand or appreciate the importance of the GSE boundaries. We had a number of meetings with people to get them to understand that this is important. You really have to understand and ask yourself every time you're billing something inside the GSE, "Is this appropriate?" In an organization this size there are a lot of moving parts, and you don't see those moving parts if the questions don't get asked and they didn't.

44.    Rather than protecting the public treasury or protecting persons from the harmful effects of these acts, Treasury characterized these admissions as an important "learning experience" in how to do things better the next time.

45.    This failure to act predictably emboldened Sallie Mae and in 2014, Sallie Mae was caught misrepresenting private loans as federal loans in court proceedings.  Sallie Mae was sanctioned, and the publicity forced the Department of Education to rescind its purchase of fraudulent assets from Sallie Mae.

3.    Sallie Mae misappropriated government funds and was allowed to walk out the front door of the United States Treasury because government officials were unable to "reach consensus" on the precise meaning of the law.  This crocodile confusion is beneath the dignity of the United States Treasury.  There was no need for private consensus when the law has always been clear: there is no "rationale for the expenditure of federal funds which serve to benefit directly this type of private business venture without explicit congressional authorization."

## V.     CAUSES OF ACTION

### Count I: 28 U.S.C. § 2201

4.      Tate and Bannister incurred private loans originated by Sallie Mae prior to Sallie Mae's acquisition of a banking charter.

5.      Sallie Mae represented these loans were funded with federal dollars and funded with private dollars.

6.      Under color of federal authority, this government's agent has taken Bannister and LaBarron's property to satisfy debts that were void, illegal, and discharged.

7.      This government created Navient, this government knows its character, and this government knows that it is acting in violation of the law.

8.      Tate has submitted multiple written complaints to this government regarding the contradictory information Tate has been given about this loan, including through the Consumer Finance Protection Bureau.

9.      This government has refused to entertain Tate's grievances, and has refused to enjoin or reprimand its agent.

10.     Defendant accepted a written statement from Sallie Mae that loans would "not be funded with proceeds from debt issued by the GSE" and loans would not be sold to the GSE.

11.     Art. I, § 9, cl. 7, provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." "Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute."[8]

---

[8] *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424 (1990).

12.     Plaintiffs requests declaratory judgment 28 U.S.C. § 2201 that the United States Congress never authorized public funds to be used for the origination of Tate's or Bannister's Loans and that these Loans were not insured or guaranteed under Part B nor made under Part E nor Part D of Title 20, nor otherwise made, insured, guaranteed or in any way funded nor authorized by the United States Treasury.[9]

## Count Two: 5 U.S.C. § 706

13.     Sallie Mae's statutory charter prohibited Sallie Mae from originating student loans. Defendant knew that Sallie Mae "was not authorized by its charter to originate student loans" and yet repeatedly suspected that that Sallie Mae was not "honoring the restriction against its being in the primary versus secondary market when it acquired certain private student loans."

14.     Defendant ultimately concluded that, "Sallie Mae, in substance, was originating certain private loans," and a "former member of SLMA's management and board conceded that SLMA was in effect 'originating loans for a long time.'"

15.     Defendant failed to enjoin Sallie Mae's origination or collection of Tate and Bannister's Loans on the spurious grounds that there was no consensus on "the public purpose of the GSE in specific terms," and "weak enforcement tools" "made addressing the non-mission activity issue problematic."

16.     Under the APA, 5 U.S.C. § 706, a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without

---

[9] *United States v. McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016).

observance of procedure required by law; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

17.     Sallie Mae was prohibited from originating loans by its statutory charter.

18.     Sallie Mae's officers admitted they had originated loans.

19.     Defendant concluded Sallie Mae was originating loans.

20.     Defendant's failure to take remedial action is a final action.

21.     Defendant arbitrarily and capriciously failed to fulfill its Congressional mandate to prevent Sallie Mae from originating billions of dollars of usurious loans in direct violation of its statutory charter.

22.     This court should set aside Defendant's statement that it could not reach consensus on how to address Sallie Mae's practice of illegally originating loans and compel Defendant to enforce the legal consequences of its conclusion that "Sallie Mae was originating private loans."

### Count Three: 5 U.S.C. § 706

23.     Defendant extracted written assurances from Sallie Mae in 1998 that loans "originated by non-GSE affiliates during the GSE wind down period would not be sold to the GSE" on the grounds that it was prohibited by 20 U.S.C. § 1087-3. "The Association shall not extend credit to the Holding Company nor guarantee or provide any credit enhancement to any debt obligations of the Holding Company," and "under no circumstances shall the assets of the Association be available or used to pay claims or debts of or incurred by the Holding Company."

24.     Treasury concluded that "the GSE had purchased loans originated by a non-GSE affiliate," which OSMO only discovered because "Sallie Mae had represented in SEC filings that this non-GSE affiliate 'originates its loans.'"

25. Defendant was unable to stop this conduct after Sallie Mae rejoined that "the term 'origination' has many different meanings," and Treasury only had "weak enforcement tools" to combat this riddle.

26. Defendant's failure to take remedial action was a final action.

27. Under the APA, 5 U.S.C. § 706, a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

28. Sallie Mae was using funds of the Association to originate private loans for SLM Corporation.

29. This Court should set aside Treasury's finding that "weak enforcement tools" and Sallie Mae's sarcasm are sufficient justifications to avoid preventing misuse of federal funds and compel Defendant to enforce the legal consequences of its conclusion that Sallie Mae had misused federal funds for private purposes.

## VI.    PRAYER

30. In light of the foregoing, Plaintiff request that the parties be joined to this action and Plaintiff receive:

(1)    declaratory judgment and other equitable remedies;

(2)    other such relief as the Court deems just and proper.

June 10, 2020

By: /s/ Austin Smith     


Austin C. Smith
**Smith Law Group llp**
3 Mitchell Place
New York, New York 10017
(917) 992-2121
austin@acsmithlawgroup.com