UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LABARRON TATE,<br>SARAH BANNISTER, BRANDON HOOD,<br><br>Plaintiffs,<br>  v.<br><br><br>STEVEN T. MNUCHIN, in his official capacity as the SECRETARY OF THE TREASURY, THE UNITED STATES TREASURY DEPARTMENT in its sovereign capacity, BRIAN P. BROOKS, in his official capacity as the acting COMPTROLLER OF THE CURRENCY,<br>Defendants | Case Number 20-cv-4458 |

# FIRST AMENDED COMPLAINT

1

.

## I. PARTIES

2. Sarah Bannister is an individual who incurred private loans from Sallie Mae.

3. LaBarron Tate is an individual who incurred private loans from Sallie Mae and attended Full Sail University.

4. Brandon Hood is an individual who incurred private loans from Sallie Mae.

5. The Honorable Steven T. Mnuchin is the Secretary of the Treasury and an officer of the government and may be served in the District of Columbia.

6. The Honorable Brian P. Brooks is the acting Comptroller of the Currency and an officer of this government and may be served in the District of Columbia.

7. The United States Treasury Department is an executive agency and may be served in the District of Columbia.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § § 1331, 2201 because this case arises under federal law.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because this is an action against the government, and no real property is involved.

## III. FACTS

### A. The Higher Education Act of 1965

10. The Higher Education Act of 1965 authorized the Guaranteed Loan Program ("GSL" and later the "FFEL Program" or "FFELP"), and the National Direct Student Loan (later "Perkins Program" and collectively as "Title IV Loan Programs").

11.     Title IV Loans were federally insured or funded loans made to students at below market interest rates, without credit checks, without cosigners and "without business considerations."

12.     The Title IV Loan Programs required a large administrative apparatus, which Congress intended to accomplish through a public-private partnership.  In addition to the colleges and universities, managing the loan programs would require the participation of banks, sureties, state agencies, servicing agents, and debt collectors.

13.     Since 1965, Congress has insured, guaranteed or funded $2.4 trillion in student loans, a portfolio equaling approximately one half of this government's assets. Yet owing in large part to the conduct of Navient (formerly known Sallie Mae) the Title IV Programs are universally criticized and mistrusted.

## B.  1972-1996: Sallie Mae

14.     In 1972, Congress created the Student Loan Marketing Association ("Sallie Mae") in order to facilitate the secondary market for Title IV Loans.

15.     Sallie Mae was a government services entity, or GSE, a corporation chartered by Congress but operated by private enterprise.

16.     Congress hired Edward Fox, a thirty-six-year-old assistant from the home loans department, as the first CEO. Fox was an odd choice. He had never worked in finance, was outspokenly not interested in either government service,[1] or education,[2] and once described the tenets underpinning Sallie Mae's charter as "the most simplistic pap I have ever heard in my life."[3]

---

[1] "The culture of the people who started the business was free enterprise – the notion that you didn't need government to do anything."

[2] "We're not educators and we don't pretend to be."

[3] But see, "we were getting clobbered. We were losing on every loan we owned. We needed help in the Congress immediately."

3

17. Fox was soon to remake Sallie Mae in his own image. Under Fox's leadership, Sallie Mae spent most of its time perfecting the art of OTC arbitrage swaps and by 1990, Fox had loaded Sallie Mae with more than $20 billion in taxpayer secured debt.

18. Sallie Mae also expanded the volume of FFELP Loans by purchasing FFELP Loans from banks in order to provide new capital to make more FFELP Loans.

19. The economic gains crated by this activity were supposed to reduce interest rates over time.

20. Unfortunately, this did not happen and Treasury concluded it was because the economic subsidy provided by the government was mostly captured by Sallie Mae's shareholders. Treasury thus concluded that, "Sallie Mae's story is one of a basic conflict."

21. This and other unresolved conflicts of interest ended in a massive bribery and fraud scandal. "The Department of Education had all but abdicated its responsibility to the students it is supposed to service and the taxpayers whose interests it is charged with protecting. Fraud and abuse were able to thrive because through gross mismanagement, ineptitude, and neglect in carrying out its regulatory and oversight functions. We have heard no testimony or seen any documents that suggest that the Department has done even an adequate job in managing and overseeing its student loan program."

22. Congress thereafter became disillusioned with the FFEL Program and authorized the creation of the Direct Loan Program ("DLP") that would eliminate the need for a secondary market by lending federal dollars directly to students. Congress hoped that in time it could finally rid themselves of this turbulent GSE and terminate the FFEL Program.

23. Congress also enacted criminal penalties to prevent these types of "accounting-irregularities" in the future and ordered the Secretary of Education to get control of Sallie Mae and the other contractors.

24. The Department issued a host of new regulations explicitly prohibiting conflicts of interest and misuse of public funds, which Sallie Mae and others vehemently protested. Sallie Mae even sued the federal government for violating its constitutional rights and challenged the prohibition on using taxpayer money to pay the legal fees. "The Secretary does not believe that it is an appropriate use of taxpayer funds to pay for the agencies' unsuccessful court challenges. The Secretary notes that the right to sue the Federal Government does not include the right to use Federal property to do so."

25. Sallie Mae lost and although it was forced to accept that it owed the government a fiduciary duty, Sallie Mae continued to state that its principal, the federal government, was also Sallie Mae's "primary competitor" in the student loan industry.

26. This was not yet an acceptable way for an agent to behave or speak to its principal in the mid-1990s, and many on the Hill and in the Administration became enraged.

27. Congress finally gave Sallie Mae an ultimatum: banishment or liquidation.

### C. Private Loans and the Privatization Act: 1996-2004

28. Banishment of course did not mean actual banishment in the sense of a punishment. It meant something more like privatization. And Congress gave Sallie Mae ten years to complete the process of privatization.

29. But in order to "ensure that Federal funds are not subsidizing non-FFEL guaranty activity," Congress split Sallie Mae split into two: the public entity called SLMA or the GSE

5

would hold all the federal property and federal assets while a new private corporation known as SLM Corp. would be used to conduct new commercial activity.

30. Treasury created the Office of Sallie Mae Oversight ("OSMO" or "Treasury") to police the "firewall" that was supposed to keep the public funds completely separate from commercial activity.

31. SLMA had approximately $50 billion in federal assets, which Congress insisted be spent furthering the secondary FFELP market. SLMA was only allowed to facilitate the secondary market and could not originate FFELP Loans.[4] And under no circumstances could the assets of the GSE be available or used to pay claims or debts of or incurred by SLM Corp.

32. The GSE had to be dissolved no later than 2008 and if any loans were made or facilitated by SLM, they could "not be funded with proceeds from debt issued by the GSE nor sold to the GSE."

33. The chief problem with enforcing this "firewall" was that it was an largely arbitrary distinction from a human resources standpoint and existed primarily in the minds of legislators and the accounting department.

34. Both SLMA and SLM Corp continued to refer to themselves as Sallie Mae. For example, in one Turn-Key contract, a single executive who worked for both SLMA and SLM negotiated and executed the contract on behalf of SLMA and SLM.

35. Edward Fox had once boasted of having no small role in creating what he first described as "non-insured loans." "We would do all the work. We would originate the loans and make them available. They would go on their books for about 30 seconds and they would get X

---

[4] Except as lender of last resort.

6

dollars just for putting their imprimatur on it. Then it would move to us. End of the story is we made $30 million dollars in loans the first year."

36. Non-Insured loans would ultimately become what today are called "private student loans" and SLM's business plan for privatization was to enter the burgeoning world of private student lending.

37. To accomplish this, Sallie Mae offered national banks the system designed by Fox that it dubbed "turn-key loan processing services" ("Turn-Key Servicers"). This was a service that leased out Sallie Mae employees and hardware to perform back-office loan processing for national banks.

38. Sallie Mae would process the loan applications, approve the loans and originate the loans using the national banks' money. After the loans were made, Sallie Mae would buy the loans and then securitize them into tax-exempt bonds.

39. This was not a particularly sophisticated operation, and Sallie Mae's competitive advantage was its connection to and confusion with the government, as one of Fox's colleagues had candidly described to Congress: "Sallie Mae's chief selling point is the perceived ties to the government [and the] fact that Sallie Mae's securitizes are exempt from State and local taxation all contribute to the perception that Sallie Mae is an agency security."

40. Congress and Treasury permitted Sallie Mae to *facilitate* the origination of private loans and to purchase loans on the secondary market, but Sallie Mae was not permitted to *originate* private loans.

41. Treasury, however, soon began to suspect that Sallie Mae was using its Turn-Key Services as a means of blurring these lines.

42. Treasury wrote in one report that, "SLMA in substance, was originating private loans through its back-office servicing agreements under which SLMA would process and disburse the loans." [5]

43. When Sallie Mae tried to deny this allegation, Treasury showed them the SEC filings where Sallie Mae had reported that it was originating loans. Sallie Mae was forced to confess— but cyclops on its way out that, "origination has many meanings."

44. Treasury failed to observe or else failed to report that in addition to originating private loans in violation of its statutory charter, Sallie Mae was also using federal funds to originate the loans.

45. Sallie Mae executed the Turn-Key contracts with national banks as SLMA but subcontracted the work to SLM, and also inserted a contract provision that allowed SLM to use funds from the GSE to directly originate private student loans.[6]

46. Sallie Mae was thus using federal funds to originate private student loans in express violation of its fiduciary duties, Titles 12 and 20, and numerous provisions of Title 18.

47. Thereafter, Sallie Mae represented to the Plaintiffs that their private loans were funded either in whole or in part by the government.

48. Originating loans in express violation of a statutory charter makes the loans void. *In re Grand Union Co.*, 219 F. 353, 362–63 (2d Cir. 1914) ("There is no principle of law better settled than that a corporation cannot enter into a contract which is expressly prohibited by its charter or by statute. A contract so made is absolutely void.").

---

[5] "The funding banks did not take long term possession of the notes signed by the student borrowers, nor did they assume the credit risk associated with the notes. Further, the economic substance of the payments by SLMA to the funding banks reflected loan origination activity via a 'storefront' rather than secondary market activity."

[6] "You acknowledge that we may subcontract with our affiliate, Sallie Mae Servicing L.P., to perform some or all of the origination and/or servicing activities that we are to perform under this Agreement."

49. While these descriptions seem to necessarily lead to the conclusion that Sallie Mae was looting the federal purse for private enrichment, Treasury concluded that nothing could be done because of "weak enforcement tools" and a lack of general consensus on how to use them.

50. Although Treasury never disclosed how many loans or how much money this involved, Sallie Mae disclosed that it constituted $3.4 billion in loans.

51. Plaintiffs have been paying on these loans for almost twenty years.

52. The United States Treasury failed to act because government officials were unable to "reach consensus" on the precise meaning of the law.

53. There was no need for private consensus when the law had always been clear: there is no "rationale for the expenditure of federal funds which serve to benefit directly this type of private business venture without explicit congressional authorization."

54. Plaintiffs bring this action for declaratory relief and to compel the government to fulfill the mandate of Congress.

## IV.     CAUSES OF ACTION

### Count I: 28 U.S.C. § 2201

55. While working as the government's agent, Sallie Mae lent money to Tate, Bannister and Hood and represented that these loans were funded with federal dollars or otherwise funded by the government.

56. LaBarron Tate incurred one such loan on July 3, 2002 at 9.75% interest.

57. Brandon Hood incurred one such loan on October 10, 2002.

58. Sarah Bannister incurred one such loan on August 9, 2005.

59. This government created Navient and continues to employ Navient as its agent.

60. Navient has represented to Plaintiffs that these debts are not void, were not discharged, and are entitled to all or many of the benefits that Congress gave to lenders originating and holding Title IV Loans.

61. Plaintiffs have submitted multiple written complaints to various arms of this government regarding the misleading and contradictory information given about these loans.

62. Under color of federal authority, this government's agent has taken Bannister's, Hood's, and LaBarron's property to satisfy illegal and void debts.

63. This government and Navient have refused to entertain the Plaintiffs' grievances and this government has refused to enjoin its agent's conduct.

64. This government has placed the Plaintiffs in a greater state of danger than they otherwise would be because it continues to employ Navient as its agent to millions of borrowers; an agent it knows is misusing the color of its office to enforce illegal debts and discharged debts against impoverished and marginalized individuals whose pleas for help are muffled in the larger and more generalized protest against the Title IV Loan Programs.

65. Art. I, § 9, cl. 7, provides that: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." "Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be authorized by a statute."[7]

66. Plaintiffs request declaratory judgment 28 U.S.C. § 2201 that the United States Congress never authorized public funds to be used for the origination of Tate's, Hood's or Bannister's Loans and that these Loans were not insured or guaranteed under Part B nor made

---

[7] *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424 (1990).

under Part E nor Part D of Title 20, nor otherwise made, insured, guaranteed or in any way funded nor authorized by the United States Treasury.[8]

### Count Two: 5 U.S.C. § 706

67. Sallie Mae's statutory charter prohibited Sallie Mae from originating student loans. Treasury knew that Sallie Mae "was not authorized by its charter to originate student loans" and yet repeatedly suspected that that Sallie Mae was not "honoring the restriction against its being in the primary versus secondary market when it acquired certain private student loans."

68. Treasury ultimately concluded that, "Sallie Mae, in substance, was originating certain private loans," and a "former member of SLMA's management and board conceded that SLMA was in effect 'originating loans for a long time.'"

69. Treasury failed to enjoin Sallie Mae's origination or collection of the plaintiffs' loans on the spurious grounds that there was no consensus on "the public purpose of the GSE in specific terms," and "weak enforcement tools" "made addressing the non-mission activity issue problematic."

70. Under the APA, 5 U.S.C. § 706, a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

71. Sallie Mae was prohibited from originating loans by its statutory charter.

---

[8] *United States v. McIntosh*, 833 F.3d 1163, 1174 (9th Cir. 2016).

72. Sallie Mae's officers admitted they had originated loans.

73. Treasury concluded Sallie Mae was originating loans.

74. The Plaintiffs' loans were originated through this scheme.

75. Treasury's failure to take remedial action against Sallie Mae is a final action.

76. Treasury arbitrarily and capriciously failed to fulfill its Congressional mandate to prevent Sallie Mae from originating billions of dollars of loans at illegal interest rates in direct violation of its statutory charter.

77. This court should set aside Treasury's statement that it could not reach consensus on how to address Sallie Mae's practice of illegally originating loans and compel Treasury to enforce the legal consequences of its conclusion that "Sallie Mae was originating private loans."

### Count Three: 5 U.S.C. § 706

78. Treasury extracted written assurances from Sallie Mae in 1998 that loans "originated by non-GSE affiliates during the GSE wind down period would not be sold to the GSE" on the grounds that it was prohibited by 20 U.S.C. § 1087-3 and that **SLMA would not extend credit to SLM Corp nor guarantee or provide any credit enhancement to any debt obligations of SLM Corp**, and "under no circumstances were the assets of SLMA be available or used to pay claims or debts of or incurred by SLM Corp."

79. Nonetheless, Treasury concluded that "the GSE had purchased loans originated by a non-GSE affiliate," which OSMO only discovered because, "Sallie Mae had represented in SEC filings that this non-GSE affiliate 'originates its loans.'"

80. Treasury claimed it was unable to stop this conduct because Treasury only had "weak enforcement tools."

81. Treasury's failure to take remedial action was a final action.

82. Under the APA, 5 U.S.C. § 706, a reviewing court shall compel agency action unlawfully withheld or unreasonably delayed and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

83. Sallie Mae was using federal funds to originate private loans for SLM Corporation.

84. This Court should set aside Treasury's finding that "weak enforcement tools" is a sufficient justification to avoid preventing misuse of federal funds and compel Defendant to enforce the legal consequences of its conclusion that Sallie Mae had misused federal funds for private purposes.

### Count Four: 5 U.S.C. § 706

85. On May 29, 2020, the OCC issued a final rule identified as "Docket ID OCC–2019–0027, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred" (Final Rule").

86. The Final Rules states, in part, that, "Transferred loans. Interest on a loan that is permissible under 12 U.S.C. § 85 shall not be affected by the sale, assignment, or other transfer of the loan."

87. The Final Rule should be set aside as arbitrary and capricious on three grounds: (1) it fails to articulate whether "permissible" includes "not impermissible;" (2) fails to differentiate between "interest rate" and the broader concept of "interest;" and (3) operates as a *de facto*

definition of the undefined term "loan" which forecloses the utility of the OCC's assurance that it is developing a separate protocol to regulate the "true lender."

88. First, the Final Rule failed to articulate whether "permissible" means only "interest which is permissible" or else includes interest that is "not impermissible." This fails to address whether 20 U.S.C § 1078, for example, which exempts from all "usury laws" any loan which is insured by a "guaranty agency under a program covered by an agreement made pursuant to subsection (b) of this section." In failing to articulate the scope of the term "permissible," the Final Rule will be used by these Title 20 guaranty agencies, including several of Sallie Mae's affiliates and subsidiaries, as the legal authority for assigning loans at illegal rates of interest which is made by an agency covered by an agreement but while acting outside the scope 20 U.S.C. § 1078.[9]

89. Second, 12 U.S.C. § 85 refers to "interest at the rate," which means "interest rate," but the Final Rule uses the term "interest," which is the sum all of the interest and fees that will be incurred over the life of the loan. By using the broader term "interest" instead of the narrower term "interest rate," the OCC has acted in excess of statutory scope.

90. Third, the critical question in any true lender analysis is whether the transaction and obligation between the bank and the borrower is labeled the loan (making the transaction between the bank and the third party non-bank a loan sale), or the transaction between the non-bank third-party and the borrower is labeled the loan (making the transaction between the non-bank and the bank the derivative transaction of advancing and repaying funds).

91. The Final Rule, which does not offer a formal definition of the term "loan," presupposes that an obligation held by a bank is a "loan," and the transaction between the bank and the non-bank third party is a "transfer of the loan." In regulating the parameters around and

---

[9] *F.D.I.C. v. Royal Park No. 14, Ltd.*, 800 F. Supp. 477, 481 (N.D. Tex. 1992), *aff'd,* 2 F.3d 637 (5th Cir. 1993)("The United States and its agents are immune from usury penalties under the doctrine of sovereign immunity.").

14

the relationship of the parties to an undefined term, the Final Rule operates as a *de facto* definition of the term "loan" and immunizes non-bank lenders dealing and uttering loans from collateral attack.

92. This *de facto* definition will frustrate the Plaintiffs' ability to demonstrate that their private loans were made by Sallie Mae and not its national banking partners.

93. This Court should set aside the OCC's Final Rule on the grounds that it is arbitrary and capricious, fails to consider an important aspect of the problem it purports to solve, and exceeds the statutory scope.

## V.   PRAYER

94. In light of the foregoing, Plaintiff request that the parties be joined to this action and Plaintiff receive:

(1) declaratory judgment and other equitable remedies;

(2) other such relief as the Court deems just and proper.

June 17, 2020

By:     /s/ Austin Smith

Austin C. Smith
**Smith Law Group llp**
3 Mitchell Place
New York, New York 10017
(917) 992-2121
austin@acsmithlawgroup.com