UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___9/28/2021___
```

| | |
|---|---|
| SARAH BANNISTER, LABARRON TATE, BRANDON HOOD, | |
| Plaintiffs, | |
| -against- | 1:20-cv-04458 (MKV) |
| UNITED STATES TREASURY DEPARTMENT, JANET YELLEN, in her official capacity as the Secretary of the Treasury, MICHAEL J. HSU, in his official capacity as the acting Comptroller of the Currency, | **OPINION AND ORDER GRANTING MOTION TO DISMISS** |
| Defendants. | |

MARY KAY VYSKOCIL, United States District Judge:

This Matter comes before the Court on the motion of the Defendant United States Treasury Department, Defendant Janet Yellen, in her official capacity as the Secretary of the Treasury, and Defendant Michael J. Hsu, in his official capacity as the acting Comptroller of the Currency[1] (collectively, Defendants), to dismiss the First Amended Complaint (FAC [ECF No. 5]) filed by Plaintiffs Sarah Bannister, LaBarron Tate, and Brandon Hood (collectively, Plaintiffs).  [ECF No. 19].  For the reasons discussed below the Motion to Dismiss is granted in full.

---

[1] Secretary of the Treasury Janet Yellen, in her official capacity, and Michael J. Hsu, in his official capacity, have now been automatically substituted as Defendants pursuant to Rule 25(d).

## BACKGROUND[2]

Plaintiffs allege that they received private student loans from the Student Loan Marketing Association (Sallie Mae).[3]  (FAC ¶¶ 2–4).  LaBarron Tate took out her loan on July 3, 2002; Brandon Hood, on October 10, 2002; and Sarah Bannister, on August 9, 2005.  (FAC ¶¶ 56–58).  Sallie Mae was created "to facilitate the secondary market" for loans issued under the "Guaranteed Loan Program . . . and the National Direct Student Loan [Program]."  (FAC ¶¶ 10, 14).  Sallie Mae was privatized over a period of time between 1996 and 2004, and Treasury created the Office of Sallie Mae Oversight to "ensure that Federal funds [we]re not subsidizing non-[Family Federal Education Loan (FFEL)] guaranty activity."[4]  (FAC ¶¶ 29–30).  In 1996, Congress split Sallie Mae into a public entity, called SLMA, that holds all federal property and assets, and a private entity, called SLM Corp., which would be used to conduct new commercial activity.  (FAC ¶ 29).  From that point forward, "if any loans were made or facilitated by SLM, they could not be funded with proceeds from debt issued by the [government services entity (GSE)] nor sold to the GSE."  (FAC ¶ 32).

"Congress and Treasury permitted Sallie Mae to facilitate the origination of private loans and to purchase loans on the secondary market, but Sallie Mae was not permitted to originate private loans."  (FAC ¶ 40).  Plaintiffs allege that eventually, Treasury "began to suspect that

---

[2] Unless otherwise noted, the facts are taken from the FAC, and are accepted as true for the purposes of this motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, this Court need not "accept as true all of the [legal conclusions] contained in a complaint."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[3] Sallie Mae was succeeded by Navient in 2014, following a corporate reorganization.  *See Travis v. Navient Corp.*, 460 F. Supp. 3d 269, 275 (E.D.N.Y. 2020).  For ease of reference and consistency, the Court will refer to this entity as Sallie Mae.

[4] The FFEL Program is a guaranteed student loan program whereby "the federal government provides a public guaranty and insurance system so that students may obtain loans in pursuit of higher education."  *Gill v. Paige*, 226 F. Supp. 2d 366, 369 (E.D.N.Y. 2002).

Sallie Mae was . . . blurring these lines." (FAC ¶ 41). They allege that Treasury became aware that "SLMA . . . was originating private loans through its back-office servicing agreements under which SLMA would process and disburse the loans." (FAC ¶ 42). "Sallie Mae was thus using federal funds to originate private student loans in express violation of its fiduciary duties, Titles 12 and 20, and numerous provisions of Title 18." (FAC ¶ 46).

Treasury did nothing to prevent Sallie Mae from originating their loans because, in the view of the Treasury, it had "weak enforcement tools" and there was "a lack of general consensus on how to use them." (FAC ¶ 49). Treasury "failed to act because government officials were unable to 'reach consensus' on the precise meaning of the law." (FAC ¶ 52).

With respect to the Office of the Comptroller of the Currency (OCC), Plaintiffs allege that, on May 29, 2020, it "issued a final rule identified as 'Docket ID OCC-2019-0027, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred' ([']Final Rule')." (FAC ¶ 85). "The Final Rule states, in part, that, 'Transferred loans. Interest on a loan that is permissible under 12 U.S.C. § 85 shall not be affected by the sale, assignment, or other transfer of the loan.'" (FAC ¶ 86). The rule clarified that "when a national bank or savings association . . . sells, assigns, or otherwise transfers a loan, interest permissible before the transfer continues to be permissible after the transfer." *See* Office of the Comptroller of the Currency, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, 2020 WL 2836957, 85 Fed. Reg. 33,530, 33,530 (June 2, 2020) (hereinafter, Final Rule). This rule "reaffirm[ed] the longstanding understanding that a bank may transfer a loan without affecting the permissible interest term." *Id.*

The Final Rule does not "address which entity is the true lender when a bank transfers a loan to a third party." Final Rule, 85 Fed. Reg. at 33,534. To address that issue, on July 2020,

3

the OCC proposed a new regulation to determine which entity is the "true lender" when a national bank or Federal savings association makes a loan in the context of a partnership between a bank and a third party.  Under this proposed rule, "a bank makes a loan if, as of the date of origination, it is named as the lender in the loan agreement or funds the loan."  National Banks and Federal Savings Associations as Lenders, 85 Fed. Reg. 44,223 (proposed July 22, 2020) (hereinafter, True Lender Rule).

Plaintiffs filed their Complaint in June 2020, [ECF No. 1], and their First Amended Complaint one week later, (FAC).  Their claimed injuries are that: "Navient has represented to Plaintiffs that these debts are valid and are entitled to all or many of the benefits that Congress gave to lenders originating and holding Title IV Loans but not eligible for any of the federal protections and benefits," (FAC ¶ 60); "[u]nder color of federal authority, this government's agent has taken Bannister's, Hood's, and LaBarron's property to satisfy illegal and void debts," (FAC ¶ 62); and that "[w]hile working as the government's agent, Sallie Mae lent money to Tate, Bannister and Hood and represented that these loans were funded with federal dollars or otherwise funded by the government," (FAC ¶ 55).

Plaintiffs first seek a declaratory judgment that "the United States Congress never authorized public funds to be used for the origination of Tate's or Bannister's Loans and that these Loans were not insured or guaranteed under Part B nor made under Part E nor Part D of Title 20, nor otherwise made, insured, guaranteed or in any way funded nor authorized by the United States Treasury."  (FAC ¶¶ 55–66).  Plaintiffs also seek relief under the Administrative Procedure Act (APA), in the form of an order compelling the Treasury to enjoin Sallie Mae from originating private loans.  (FAC ¶¶ 67–93).

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alterations, internal quotation marks, and citations omitted).

## ANALYSIS

### I.   Plaintiffs Lack Article III Standing To Assert Their Claim

Defendants' first argument is that Plaintiffs lack Article III standing to assert their claim. Defendants assert that: (1) Plaintiffs have not sufficiently alleged that any injury they suffered was traceable to the Treasury's alleged decision not to prevent Sallie Mae from originating Plaintiffs' loans or the OCC's promulgation of the Final Rule; and (2) that Plaintiffs have failed to sufficiently allege that their alleged injury would be redressed by a favorable decision.  (Def. Memorandum in Support of Mot. To Dismiss (Def. Mot.) [ECF No. 20], at 7).  The Court agrees with Defendants.

Article III of the U.S. Constitution requires an "actual case or controversy" between the parties to a suit in order for a federal court to entertain the action.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  One of the underlying principles of Article III standing

requirements is that they "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 408 (2013). "[S]tanding is a federal jurisdictional question 'determining the power of the court to entertain the suit.'" *Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir.2010) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). "[S]tanding consists of three elements': the individual initiating the suit 'must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Dhinsa v. Krueger*, 917 F.3d 70, 77 (2d Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). The party seeking to invoke federal jurisdiction bears the burden of establishing each of these elements. *Spokeo*, 136 S. Ct. at 1547. Defendants' motion focuses on the later two requirements.[5]

### A.  The Alleged Unlawful Conduct In The Complaint Is Not Traceable to Defendants

"The traceability requirement for Article III standing means that the plaintiff must 'demonstrate a causal nexus between the defendant's conduct and the injury.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (citation omitted). "[T]he injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quoting *Simon v. E. Kentucky Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

Plaintiffs have not sufficiently alleged that their injuries are traceable to the actions of Defendants. Plaintiffs' allegations are directed at the conduct of Sallie Mae, the entity that allegedly impermissibly originated Plaintiff's loans, not Treasury or the OCC. Plaintiffs have

---

[5] Defendants do not challenge the first element of Article III standing: Injury in Fact. As such, the Court need not address this element.

not added Sallie Mae as a defendant in this action.  As such, Plaintiffs' injuries are "highly

indirect and 'result[] from the independent action of some third party not before the court.'"

*Allen v. Wright*, 468 U.S. 737, 757 (1984) *abrogated on other grounds by Lexmark Int'l, Inc. v.

Static Control Components, Inc.*, 572 U.S. 118 (2014) (quoting *E. Kentucky Welfare Rts. Org.*,

426 U.S. at 42).  Consistently, the Supreme Court, and the rest of the judiciary, have held that

plaintiffs fail to show traceability where their alleged injuries are caused by third parties'

intervening conduct.  *See id.* at 756–57 (no standing to sue Treasury officer where plaintiffs

alleged that tax exemptions provided to schools with discriminatory policies diminished

plaintiffs' ability to have their children educated in integrated schools); *E. Kentucky Welfare Rts.

Org.*, 426 U.S. at 41–45 (no standing to sue Treasury officer where plaintiffs alleged that IRS

ruling allowing favorable tax treatment to nonprofit hospital offering only emergency room

services to indigents resulted in denial of services to plaintiffs); *Fla. Audubon Soc. v. Bentsen*, 94

F.3d 658, 669–70 (D.C. Cir. 1996) (holding that plaintiffs did not show a causal link between a

decision to authorize a federal tax credit for a fuel alternative that might require ethanol and

increased pollution from the growing of corn needed to make ethanol); *Friends of Animals v.

Ashe*, 174 F. Supp. 3d 20, 32 (D.D.C. 2016) (fate of rhinoceros that plaintiffs' members wanted

to view depended on independent actions by foreign governments and hunters, not the Fish and

Wildlife Service's decision to allow imports of sports hunt trophies).

      With respect to the OCC, Plaintiffs do not sufficiently allege that the OCC has authority

to regulate Sallie Mae.  Nor could they.  The OCC charters, regulates, and supervises national

banks and federal savings associations as well as federal bank branches and agencies of foreign

banks.  *See* 12 U.S.C. §§ 1 et seq.  It does not regulate or have any authority over Sallie Mae, the

entity that originated and currently services Plaintiffs' loans.  Moreover, the only OCC action

that Plaintiffs challenge is the Final Rule, which was promulgated more than fifteen years after Plaintiffs' alleged injuries.

Plaintiffs cite to *Constitution. Party of Pa. v. Aichele*, 757 F.3d 347 (3d Cir. 2014) to rebut Defendants' arguments regarding traceability.  (Plaintiff Memorandum in Opposition to Motion to Dismiss (Pl. Opp'n) [ECF No. 21], at 8).  However, that case is inapposite.  Leaving aside that it is out-of-circuit authority, in *Constitution Party*, certain minor political parties in Pennsylvania sued the Commonwealth, challenging a statute that allowed private parties to object to their political nominations and as a result, impose significant litigation costs on the plaintiff political organizations.  757 F.3d at 352–55.  The Third Circuit rejected an argument that the objection of the private parties was an intervening act that destroyed traceability.  *Id.* at 366–68.  However, unlike here, the third-party intervening act of the private objectors was ancillary to the claims in the case because it was the State that held the proceeding to evaluate the objection and therefore, the state that imposed the litigation costs on the plaintiffs.  *Id.* 352–53 ("The Commonwealth cannot hide behind the behavior of third parties when its officials are responsible for administering the election code that empowers those third parties to have the pernicious influence alleged in the Complaint.").  Here, the third-party intervening act of Sallie Mae is the act that plaintiffs are claiming is causing them injury.  Further, in *Constitution Party*, plaintiffs would otherwise have no prospective relief without the intervention of the Court because they would never obtain standing until after an unknown private party had objected.  *Id.* 367.  Conversely, Plaintiffs know who is allegedly causing their injury here: Sallie Mae.

Plaintiffs also assert that they have standing to sue Defendants because the funds used are government money.  (Pl. Opp'n 9).  Not only is this argument implausibly broad; the cases that Plaintiffs cite to support this argument do not even address Article III standing issues.  *See U.S.*

*Dep't of Housing and Urban Dev. v. Capolino Constr. Corp.*, No. 01 Civ. 390 (JGK), 2001 WL 487436, *4 (S.D.N.Y. May 7, 2001); *Palmiter v. Action, Inc.*, 733 F.2d 1244, 1246 (7th Cir. 1984).

### B.  It Is Not Likely That Any Favorable Decision Would Redress Plaintiffs' Alleged Injury

To meet the redressability element of Article III standing, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Defs. of Wildlife*, 504 U.S. at 561 (quoting *E. Kentucky Welfare Rts. Org.*, 426 U.S. at 38, 43).

Plaintiffs seek a declaration that "the United States Congress never authorized public funds to be used for the origination of Tate's, Hood's, or Bannister's Loans and that these Loans were not insured or guaranteed under Part B nor made under Part E nor Part D of Title 20, nor otherwise made, insured, guaranteed or in any way funded nor authorized by the United States Treasury."  (FAC ¶ 66).  However, to the extent Plaintiffs' alleged injury is their obligation to continue to repay an allegedly void debt to Sallie Mae, which is not a party to this suit, the requested declaration would not redress any harm relevant to the Defendants' conduct.  What makes a judicial pronouncement a "proper judicial resolution of a 'case or controversy' rather than an advisory opinion—is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*."  *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (emphasis in original).  Such a judicial pronouncement as Plaintiffs seek would not impact Defendants' behavior; at most, the declaratory relief sought might only impact Sallie Mae's, which is not a party to this action.

As noted, the OCC does not regulate Sallie Mae, *see* 12 U.S.C. §§ 1 et seq.  Moreover, Plaintiffs do not allege that the Final Rule affects how Treasury exercises its discretion.

Plaintiffs counter that if they obtain a favorable outcome here, they "will at last know the legal character of their debts and can either refute Navient's representations, or else seek assistance from the Department of Education." (Pl. Opp'n 9–10). However, the ability of Plaintiffs to obtain relief from either party not before the Court is speculative at best. *See E. Kentucky Welfare Rts. Org.*, 426 U.S. at 43 (concluding that plaintiffs failed to establish redressability because it was speculative whether the relief sought would result in desired action by third party not before the court).

As such, Plaintiffs lack Article III standing to sue Defendants. Therefore, Defendants' Motion to Dismiss is granted and the action is dismissed for lack of jurisdiction.

## II. Plaintiffs Fail To State A Claim Under Either The APA Or Declaratory Judgment Act

Even if Plaintiffs had standing, they fail to state a claim upon which relief could be granted under either the APA or the Declaratory Judgment Act to bring this case.

### A. Plaintiffs Fail To State A Claim Against Treasury

Defendants assert three reasons for why Plaintiffs fail to state a claim for relief: (1) Plaintiffs have not alleged a final agency action, as required to assert an APA claim, (Def. Mot. 10–11); (2) Plaintiffs' claims are time-barred, (Def. Mot. 11); and (3) even if Treasury had authority to enjoin Sallie Mae from originating Plaintiffs' loans, that any such decision was discretionary, (Def. Mot. 12–13).

#### 1. Plaintiffs Fail To Allege A Final Agency Action

When a plaintiff challenges an agency's failure to act, the challenge is reviewable under the APA "only where a plaintiff asserts that any agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Plaintiffs have not alleged a final agency action as required to assert a valid APA claim. Plaintiffs identify

10

no source of law requiring Treasury to enjoin Sallie Mae from originating the loans at issue. Plaintiffs' sole allegation regarding Treasury's oversight responsibilities asserts that Treasury's Office of Sallie Mae Oversight was created "to police the 'firewall' that was supposed to keep the public funds completely separate from commercial activity." (FAC ¶ 30). However, without any source of law to support it, this allegation is insufficient.

In their brief, Plaintiffs cite to 31 U.S.C.A. § 321 and 20 U.S.C. § 1097 as requiring the Treasury to enjoin Sallie Mae from originating the loans at issue. Pl. Opp'n 11. Section 321(a) merely requires Treasury to "prescribe regulations . . . [that] promote the public convenience and security, and . . . protect the Government and individuals from fraud and loss, that apply to anyone who may (A) receive for the Government, Treasury notes, United States notes, or other Government securities; or (B) be engaged or employed in preparing and issuing those notes or securities[.]" 20 U.S.C. § 1097 creates criminal penalties for anyone who "willfully embezzles, misapplies, steals, obtains by fraud, false statement, or forgery, or fails to refund any funds, asset, or property provided or insured under this subchapter[.]" Neither statute requires Treasury or the OCC to enjoin Sallie Mae as the Plaintiffs assert or creates a private right of action for a citizen or borrower from Sallie Mae to redress any failure by Treasury or OCC to issue such an injunction.

## 2.  Plaintiffs' Claims Are Time-Barred

Plaintiffs' claims are also time-barred. Substantive challenges under the APA are governed by the six-year catch-all statute of limitations for federal claims unless a different limitations period is specified by statute. *Sai Kwan Wong v. Doar*, 571 F.3d 247, 263 (2d Cir. 2009); 28 U.S.C. § 2401(a). Suits challenging final agency action pursuant to section 704 must similarly be commenced within six years after the right of action accrues. *Harris v. F.A.A.*, 353

11

F.3d 1006, 1009-1010 (D.C. Cir. 2004). "Under the APA, the statute of limitations begins to run at the time the challenged agency action becomes final." *Sai Kwan Wong*, 571 F.3d at 263; *see also* 5 U.S.C. § 704.

Plaintiffs allege that the final agency action at issue is "Treasury's failure to take remedial action against Sallie Mae" at the time their loans were originated, which was in 2002 and 2005. (FAC ¶¶ 56–58, 75); *see Top Choice Distributors, Inc. v. U.S. Postal Serv.*, 138 F.3d 463, 466 (2d Cir. 1998) (agency action final when "the action [is] one by which rights or obligations have been determined or from which legal consequences will flow" (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997))); *see also Franklin v. Massachusetts*, 505 U.S. 788, 796–97 (1992) ("[t]o determine when an agency action is final," the Supreme Court "looked to, among other things, whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business'" (internal quotation marks omitted)). Plaintiffs did not file their claims until 2020, at least 15 years after their causes of action accrued and after Sallie Mae was privatized, (FAC ¶ 28). Plaintiffs' claims are therefore time-barred.

Plaintiffs argue that no statute of limitations applies in cases involving theft of government money, (Pl. Opp'n 17–18), but all the cases Plaintiffs cite involve suits by the government to recover federal funds. That is not the nature of Plaintiffs claims. By contrast, APA claims against the government such as what Plaintiffs seek to assert are governed by the six-year statute of limitations under 28 U.S.C. § 2401(a).

Plaintiffs also assert that § 2401(a) is not jurisdictional and that their claims are subject to equitable tolling. (Pl. Opp'n 18). However, assuming without deciding that this is correct, Plaintiffs plead no facts to justify any tolling. "Equitable tolling permits a plaintiff to avoid the bar of the statute of limitations if despite all due diligence," that plaintiff "is unable to obtain

vital information bearing on the existence of his claim." *Valdez ex rel. Donely v. U.S.*, 518 F.3d 173, 182 (2d Cir.2008) (citation and internal quotation marks omitted).  Plaintiffs do not allege that they took any affirmative steps to protect their rights or pursue their claims against Defendants for at least 15 years.

Plaintiffs last assert that the continuing-violation exception applies because the conduct is still ongoing.  (Pl. Opp'n 19–20).  However, they cite to no cases where a federal court has applied this exception in the context of APA actions.  Conversely, the Court is aware of several Circuit decisions holding otherwise.  *See*, *e.g.*, *Izaak Walton League of Am., Inc. v. Kimbell*, 558 F.3d 751, 758–62 (8th Cir. 2009) (holding that the continuing violations doctrine did not apply to the Forest Service's alleged failure to implement motorboat quotas under the Boundary Waters Canoe Area Wilderness (BWCAW) Act and that the plaintiffs' claim accrued when the Forest Service published regulations indicating that the area in question fell outside of the BWCAW boundary); *Preminger v. Sec'y of Veterans Affairs*, 517 F.3d 1299, 1306-08 (Fed. Cir. 2008) (holding that the continuing violations doctrine did not apply to the plaintiff's challenge to an agency's failure to subject a regulation to the notice and comment rulemaking process and that the plaintiff's claim accrued when the regulation was finalized; noting that "were we to accept the plaintiff's continuing violation theory, there effectively would be no statute of limitations because the injury would always be ongoing").

As such, Plaintiffs claims are time-barred under the APA.

### 3.  Any Authority Of Defendants Was Discretionary

Any challenge to an agency's failure to act under the APA requires the "plaintiff assert[] that any agency failed to take . . . action that it is required to take."  *S. Utah Wilderness All.*, 542 U.S. at 64.  Plaintiffs have not identified any statute giving rise to a non-discretionary

13

responsibility by Treasury to enjoin Sallie Mae.  Plaintiffs merely complain that Treasury

decided not to bring an enforcement action against Sallie Mae.  (FAC ¶¶ 49–54).  "[A]n agency's

decision not to . . . enforce . . . is a decision generally committed to an agency's absolute

discretion."  *Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *see also Nat. Res. Def. Council, Inc.*

*v. U.S. Food & Drug Admin.*, 760 F.3d 151, 170–71 (2d Cir. 2014).

Plaintiffs counter that Treasury's failure to enjoin Sallie Mae was not left to the agency's

discretion and that there is sufficient law for the Court to apply in assessing the legality of

Treasury's conduct.  (Pl. Opp'n 12–16).  However, none of Plaintiffs' cited authorities further

their argument.  They first cite to factual assertions in their own complaint, (Pl. Opp'n 12), which

is clearly insufficient to allege a source of *law*.  They also cite 31 U.S.C. §§ 321, 3542, and 3545.

(Pl. Opp'n 13–14).  However, section 321 merely requires Treasury to promulgate regulations to

protect the government from fraud, and sections 3542 and 3545 concern distress warrants and

civil actions where "a person accountable for public money" "neglects or refuses to pay."

Plaintiffs also cite 20 U.S.C. §§ 1078(8) and 1082, (Pl. Opp'n 14), but these merely state that

Treasury shall inform Congress if it "determines that the financial safety and soundness of [Sallie

Mae] is at risk," 20 U.S.C. § 1078(8), and that Sallie Mae "shall report to the Secretary, in such

manner and at such time as the Secretary shall require, on any financial interest which such

individual may hold in any other entity participating in any program assisted under this

subchapter,"  20 U.S.C. § 1082.  None of these authorities require Treasury to enjoin Sallie Mae

from originating student loans.

### B.  Plaintiffs Fail To State A Claim Against The OCC

Plaintiffs also have failed to state a claim for relief against the OCC.  Plaintiffs assert that

the OCC's Final Rule "should be set aside as arbitrary and capricious."  (FAC ¶ 87).  They claim

that: (1) the Final Rule "fails to articulate whether 'permissible' includes 'not impermissible,'" which is problematic because it "will be used by . . . Title 20 guaranty agencies . . . [to] assign[] loans at illegal rates of interest," (FAC ¶¶ 87–88); (2) the rule "fails to differentiate between 'interest rate' and the broader concept of 'interest,'" which has resulted in the OCC "act[ing] in excess of authority," (FAC ¶¶ 87, 89); and (3) the rule "operates as a de facto definition of the term 'loan' which forecloses the utility of the OCC's assurance that it is developing a separate protocol to regulate the 'true lender,'" and "immunizes non-bank lenders dealing and uttering loans from collateral attack," (FAC ¶¶ 87, 91).  However, none of these allegations plausibly state a claim for relief.

First, the Final Rule will not impact how Title 20 guaranty agencies set their interest rates because the OCC does not regulate "Title 20 guaranty agencies."  *See* 12 U.S.C. §§ 1 et seq. Further, Plaintiffs assert no allegations regarding the factors the OCC relied on in promulgating the Final Rule, the explanations it offered in support of the Rule, or the considerations it had when adopting the Final Rule.  *See Nat. Res. Def. Council v. U.S. E.P.A.*, 808 F.3d 556, 569 (2d Cir. 2015) (explaining what factors to consider in evaluating whether an agency decision is "arbitrary and capricious").

Second, in regard to their allegation that the Final Rule fails to differentiate between interest rate and interest, Plaintiffs do not identify any specific statute whose scope was exceeded.  Nor do they explain how the failure to add the word "rate" after "interest" might have led the OCC to act "in excess of statutory scope" or in any manner that is relevant to Plaintiffs' purported claim.

Last, Plaintiffs do not allege how the Final Rule's *de facto* definition of the term "loan" affects their ability "to demonstrate that their private loans were made by Sallie Mae and not its

national banking partners." (FAC ¶ 92). Plaintiffs' allegations in this regard are entirely conclusory and therefore do not give rise to a valid claim for relief. *Iqbal*, 556 U.S. at 679. Finally, Plaintiffs' allegations fail because the OCC has, in fact, issued a "true lender" regulation. On July 22, 2020, the OCC proposed the True Lender Rule, which states, in relevant part: "a bank makes a loan if, as of the date of origination, it is named as the lender in the loan agreement or funds the loan." 85 Fed. Reg. at 44,223. Because the OCC has issued a "true lender" rule, this Court rejects Plaintiffs' allegation that the Final Rule's failure to explicitly define the term "loan" somehow "forecloses the utility of the OCC's assertion that it is developing a separate protocol to regulate the 'true lender.'" (FAC ¶ 87).

### C. Plaintiffs' Claim For A Declaratory Judgment Is Dismissed

Plaintiffs also appear to state a claim under the Declaratory Judgment Act. (FAC ¶¶ 55–66). "However, a request for relief in the form of a declaratory judgment does not by itself establish a case or controversy involving an adjudication of rights." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950). Indeed, the statute authorizing the declaratory judgment remedy explicitly incorporates the Article III case or controversy limitation. *See* 28 U.S.C. § 2201; *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126–27 (2007). "The Declaratory Judgment Act does not expand jurisdiction. Nor does it provide an independent cause of action." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d at 731 (citing *Skelly Oil*, 339 U.S. at 671). "Therefore, a court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *Id.*; *see also Gregoire v. Citizens Bank*, No. 20-2706, 2021 WL 4127076, at *2 n.1 (2d Cir. Sept. 10, 2021). As discussed in Part I *supra* of this opinion, there is no case or controversy here to assert Article III standing. Plaintiffs also

otherwise fail to state claim for relief.  Therefore, Plaintiffs claim for a declaratory judgment is dismissed.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss, [ECF No. 19] is GRANTED.  Plaintiffs' First Amended Complaint, [ECF No. 5] is dismissed for lack of jurisdiction.


**SO ORDERED.**

**Date:   September 28, 2021**
      **New York, NY**

**MARY KAY VYSKOCIL**
**United States District Judge**